Good morning, Your Honor. Jonathan Schneller for Defendant Teresa Demint. I'd like to reserve two minutes of my argument for rebuttal. In case after case, this Court has affirmed that to secure a conviction for ERISA embezzlement, the government has to prove that the defendant acted willfully, which is to say that she understood the pension transactions in question were wrongful. It's hard to imagine a defendant for whom that principle was more relevant than Teresa Demint, who is unsophisticated, inexperienced, mourning the sudden death of her husband and suffering from cancer when she took over a company where illegal pension withdrawals had been going on for years. The defendant doesn't have to know, does she, that the – you said she has to know that it's wrongful. She doesn't have to know that it violates some particular federal statute. She just needs to know that the source of the funds came from an employee pension plan? I think it's – I think that's more or less right. I don't think she needs to know that there's a statute on the federal books that governs pension embezzlement. But she needs to know that those funds are not hers to access. She needs to know that it's wrong to go into those funds. Well, no, she needs to know that the source of the funds is an employee – they're employee retirement funds, not funds that belong to the company. That's exactly right. I think one component of knowing that it's wrong to access those funds is knowing that it's a pension plan. Well, but if someone told her that it's not wrong if we pay the money back or if we intend to pay the money back, that would be no defense to this charge. You concede that, right? No, Your Honor, I would not. I think if she – if her understanding is that what she's doing is okay. She knew that the – it was employee pension funds. Right. But somebody told her it's okay for us to take this money as long as we eventually intend to pay it back. Do you think that would be a defense to this charge? I think repayment is not a defense. The fact that she intended to repay it on its own is not a defense. But if she believed that the pension withdrawals were okay, were permissible, were not wrongful, so long as she intended to repay it. Even though she knew the funds were employee pension funds? Yes, Your Honor. I think a lot of people – I mean, I think, you know, lawyers, sophisticated people know that you can't touch pension funds. But a lot of people might not grasp the significance of a pension fund. I don't think our cases support that position at all. I think as long as the government proved that she knew these funds were employee pension funds, it doesn't matter whether she knew that taking those would violate the law or not. Your Honor, you know, I respectfully disagree, but I don't really want to go to war with you on that point, since our whole position in this case is that she was not allowed to present her defense, that she did not know that these funds were pension funds. And so I don't think, you know – No, but if it's not a defense – I'm sorry? You're saying she didn't even know they were pension funds? That was her defense at trial, yes, was that she did not know that these funds were pension funds. She said, I was – you know, I had no idea how these accounts work. I couldn't read the books. I was traumatized. I was sleeping two or three hours a night, and I was relying on my subordinates. And nobody ever said these were pension funds or that there was anything unusual about the transfers that we were undertaking. She thought the funds, I gather, belonged to the company? She did. And, you know, they had the company's name on the registration of the account. It said, you know, I think, DeMint Brothers Profit-Sharing Plan. There's no evidence in the record that she would have grasped what a profit-sharing plan was. I know that, you know, it's a technical term that a lot of people might not appreciate the significance of that term. Well, if anything, the term suggests something other than pension funds to me. It sounds like money that the company – profits of the company that the company had set aside to share with its employees. I agree, Your Honor. And until I actually practiced ERISA law myself, and until I did, I did not know what a pension plan was. I thought it was an interesting term. Mr. Schneller? Yes, sir. How was she prevented from establishing that she didn't know what these funds were? In a number of ways, Your Honor. I think the chief one, the linchpin of her case, was her unsophistication, that she was an exceptionally unsophisticated defendant. Did she testify? She did testify, yes, Your Honor. Well, didn't she testify to her background in business or her lack of background in business? She was allowed to present extremely limited testimony on that point. She started to testify about her real estate career and her struggles early on in her career when the whole subject was placed off limits by the district court, which said explicitly she's not charged with being sophisticated. So none of this evidence about how – I mean, the rest is me inferring from that statement. Essentially, it held the subject off limits on the premise she wasn't charged with being sophisticated. So she never got to talk about her early struggles in the field, but she also never got to testify that in her entire career in real estate, she was only able to perform the most rudimentary roles and settled into a position selling cheap homes to first-time homebuyers. That's a calculation. If I could just clarify Judge Silverman's question. Your focus is on whether she knew they were pension funds. She could be totally ditzy about accounting, but if somebody said this is an ERISA fund, then she would know it. She didn't have to understand it or anything else. So I'm not sure you're answering Judge Silverman's question. The fact that she was not sophisticated implies that she didn't understand the mechanisms and so on. What was her evidence that she didn't even know that they were a pension fund? How did that get blocked? It was her testimony that basically said, look, there are all these different pots of money. I was told to move money from one pot into another. You're not answering my question. What was her evidence that she did not know that this account was a pension fund? I'm sorry, Your Honor. She explicitly denied knowing that the account was a pension fund. And then the only testament the government had on the other side, if we're looking for such direct evidence, was a single line of testimony from a man who was himself implicated in these transactions, saying, yes, we discussed that they were pension plans. So it was very much a case of he said, she said, where she was not allowed to provide any of the corroborating evidence that might suggest she was the kind of person who wouldn't appreciate where these funds came from. I do think her sophistication is relevant to her testimony. If the jury knew that she was an especially unsophisticated defendant, or I should say an especially unsophisticated person, it would be more likely to believe that she wasn't paying close attention to the labels on these different accounts, that she didn't understand the significance of those labels, and that as she testified, she was operating in a sort of haze, where she was really relying on her subordinates to do these sorts of things. You don't raise a sufficiency of evidence claim, I observe. So is your case entirely on our having to hold that the district court abused its discretion in limiting the relevancy of testimony or the admissibility? Well, you know, we raised two other arguments, too, but for that, on the question of, specifically on the question of the district court's exclusionary rulings, yes, that is our case, but I think that's an easy burden for us to meet in this case, because the district court explicitly got the law wrong about the mens rea defense. As Your Honor pointed out in your opinion in the case Christian recently about expert testimony. It wasn't my opinion. I thought it was. I apologize, Your Honor. Judge Clifton labored long and hard on that. So did I, but his opinion, it's his opinion, his name's on it. I apologize for my mistake. That's okay. But as that case pointed out, when the district court applies the wrong legal standard, the ruling is by definition an abuse of discretion. And so here we have explicit statements from the district court that the mens rea standard is a knowledge standard, when in fact it was a willfulness standard, and I would argue that that's sufficient to establish an abuse of discretion. At that point, the only question is prejudice. And here the district court's ruling wasn't just wrong. It completely distorted the picture that the jury received. Just remind me, because you have, I think, maybe four distinct arguments. One is keeping out the rest of her testimony on her lack of sophistication. She was cut off on that. One was not being allowed to bring in the rest of her statements. Was it Chandler? Was that the agent who interviewed her? That was one argument we made, yes, about her confession. Another is that the accountant, Clark, was not permitted to give lay opinion testimony. That's lay opinion testimony about her sophistication. And then what's the, is there one more? There are several more. There's also the fact that the district court admitted voluminous evidence about how she spent the money. That was unflattering. And then there's the fact that the district court excluded evidence about that this money just went to ordinary business expenses rather than straight to her pocket. The bulk of the money, I should say, went to ordinary business expenses. And then finally, there's also Clark's testimony that was excluded, which that these illegal pension withdrawals had been going on in the company before she even got there. Yeah, but she didn't have any knowledge of that. She did not, but I think as the Cohen case that we said in our brief points out, when an employee of a company has previously participated in illegal transactions and then a new owner comes in, that employee's prior participation in illegal transactions is still relevant because it shows that they could have independently carried out the illegal action without the direction of the owner. So I'd urge, Your Honor, if you haven't already, to look at the Cohen case, which establishes the relevancy of that issue regardless of her knowledge. Let me ask you just one. We'll give you a little time for rebuttal. One last question about the Chandler report. Do we have the actual pages of the report? No, Your Honor. Those were never actually admitted into evidence in the district court, and so they're not part of the record on the field. Okay, but your proffer is that, I mean, his testimony leaves one with the impression that your client admitted knowing at the time of the transfers that these were employee pension funds. Your proffer is that, in actuality, what she said during the interview was, I know now that they were at the time of the interview, I know, but I didn't know at the time of the transfer. That's exactly right, Your Honor, and I believe counsel made that proffer at trial. Throughout this case, her position was that she learned about the pension nature of these funds in February 2009, which was before her interview with Chandler. All right. Let's hear from the government. We'll give you a little bit of time for rebuttal. Thank you, Your Honor. Good morning, and may it please the Court. Trisha Ewen for the United States. Your Honors, the district court did understand the wolf in this requirement and did not get the mens rea instruction wrong. It's clear from the beginning. In this statute, there's four ways to violate it, embezzling, stealing, abstracting, or converting, and the way that the statute is written is that it does not modify embezzling or stealing with wolfly. Can I just try to cut you off and maybe cut to the chase? The only issue is whether you prove that she knew that the funds were employee pension funds, right? Yes, Your Honor. I mean, we don't need to fiddle around with the mens rea, because that ends up being the only issue that's really relevant for our purposes, right? Yes, Your Honor. So let me just ask you about the Chandler testimony, because that struck me as perhaps the most obvious of the errors here. Why was – first of all, do you agree with your opponent that at the time of the interview, the defendant did not say anything about having known that these were employee pension funds when the transfers were made? No, that's incorrect, Your Honor. And another point that's incorrect is – well, what she – what's clear from the notes of the interview and the report is that she knew they were pension funds at the time, but was – she's claimed at the time of the transfer, but was told that as long as she repaid them within a year, it would be okay. But that – so in light of that, the testimony that Chandler gave at trial of her statements was not misleading. And the government would note, Your Honor, that although it wasn't admitted into the record or into evidence, the district court, Chief Judge Phillips, did have a copy of that report because it was marked by the defense because he attempted to use it to refresh the defendant's recollection when she testified, but it was not admitted. That's why – I mean, I saw references to it, and it would have been nice if we had had it, but it's just – it's simply not in the record. But you're telling us that what's in the four corners of the report are statements from the defendant that she knew at the time of the transfers that these were employee pension funds, but she just was under the incorrect impression that if she paid it back, it wouldn't be illegal? Yes, Your Honor. And there was ample other evidence – I disagree with counsel – that she did know that they were pension funds. It wasn't just the testimony of the company's controller, Mr. Pachone. There was also the testimony of Rex Ramsey, who was the broker of record for the pension fund. Yeah, but, you know, both of those witnesses really give no basis for their opinion that she knew. All they refer to is, well, the thing was called the profit-sharing plan, and that term on its own does not signal that these were employee pension funds. Yes, Your Honor, but in addition to just what the fund was called, Mr. Pachone testified that he had numerous conversations with the defendant, daily, weekly conversations about the financials of the company, and in those meetings they talked about how they were going to pay the company bills and one of the strategies. Right, but the transfers were coming from something all she knew from their testimony was that the money was coming from the profit-sharing plan, which, as I said to your opponent, to me, on its face, that doesn't say anything about it. Let the echo, I'm sorry if you're having trouble hearing me. Well, Your Honor, I would say there's more in the record than that. First of all, she was the only trustee of the pension plan for the majority of the transfers. She was a fiduciary. She was the trustee of the profit-sharing plan, right? Yes, Your Honor. All of your questions, you were trial counsel, right? Yes. Yeah, all of your questions to witnesses I thought were, I would have objected if I were defense counsel. You kept calling it the employee pension plan as though that were the name of the account. The name of the account was the profit-sharing plan. Yes, Your Honor, but in the documents of the plan, which are in the record, and particularly on page 646 of the record, it shows the plan benefits, and it plainly uses the term retirement. And it's clear from the documents that the defendant was the sole trustee for, that this was a retirement plan. And from the testimony from Rex Ramsey and Mr. Pichone, it's clear that they had conversations with her where she knew that these were monies set aside. They weren't part of the general company operating accounts, and that's why those securities had to be liquidated before they could be used to pay any bills. So I submit that there's ample evidence in the record that she knew that there was a pension fund. And then with respect, getting back to Your Honor's questions about Mr. Chandler's, Investigator Chandler's testimony, she then testified. She was the very next witness and was allowed to give her version of what she told to Investigator Chandler. So that was before the jury, and she was given a sufficient opportunity to explain that. Well, no. I mean, if the statements to Chandler were as the defense lawyer represented, I don't think you could say that letting the defendant take the stand and give contrary testimony was an adequate substitute, right? I mean, her credibility is in question. The agent's is not. So if the agent tried to say misleadingly that she admitted knowing at the time, it wouldn't be an adequate substitute to have the defendant say, well, no, actually, I told him something different. Yes, Your Honor, but it was the defense's case at that time, and they could have recalled Investigator Chandler to admit a prior consistent statement if that's what the true belief was, what was in the report, and what they could have elicited from Investigator Chandler. But they did not do that. They left it at the defendant's own version of how she recalled her statement. How about admission of the uses to which she put the money? Unflattering uses, obviously, gambling and the like. Why was any of that relevant? Beyond just the fact that maybe she used some of the money to pay her personal expenses, why was it permissible to get into the specifics of what she used the money for? Yes, Your Honor. Well, it was in part to prove the defendant's fraudulent intent, and it was also admitted under 404B with proper limiting instructions. Why is it even relevant is what I'm saying to her, whether she knew these were employee pension funds. Who cares if she used it for gambling, to buy a fur coat, to buy a Jaguar? Who cares? Well, Your Honor, once we get over the hurdle that she knows they're pension funds, the government had to prove that she unlawfully and willfully abstracted or converted the funds of the plan to her own use and to the use of another. And in this case, it wasn't that we had checks directly from the company written to her so we could see a clear flow of funds. But she would have been just as guilty. Tell me if I'm wrong. She would have been just as guilty if she had used every penny of that money to pay business expenses, right? Yes, Your Honor. But in this case, it went to show her motive of why she was doing this. In light of the financial difficulties that the company was going through, that she had a motive to continue to find additional funds to keep the bills, both the company bills and her personal bills, being covered through those, which showed the motive for why she took the money from the pension fund. Yeah. And, Your Honor, in addition to that, just note that Chief Judge Phillips did give the proper limiting instructions and that it went to her primarily to show her motive for why she knew what was going on and why she continued to authorize those transfers. Your Honor, the defense conflates two types of evidence related to the actions of the past presidents. So, first, the testimony was consistent through many witnesses that the defendant wasn't at the company before she was president. So the actions of prior pension withdrawals, to the extent that there were any, were just not relevant. And we would note that there really was no evidence. That's not altogether clear. If there was a practice within the company of doing this, and she steps in and she's looking and presented with an ongoing practice, it seems to me that a jury might be willing to say, well, she didn't originate this scheme, and it gives some credibility to the notion that she didn't have the financial sophistication to realize that what she was presented with as company practice was illegal. Yes, Your Honor, but in the record, there was no evidence that there were unlawful withdrawals from the pension plan by prior presidents. What we had was testimony from Mr. Ramsey, the broker of record, that before the defendant was president, all the withdrawals were routine and small. Withdrawals from? From the pension, from the profit-sharing plan. And they were? That the requests came from the controller of the company primarily, and they were routine when someone left the company and was taking a small. So there was no evidence that there was any use of those monies to pay business expenses or personal? There was not, not from what came into the record. And while the defense attempted and hoped to get that in through Richard Clark, even the charts that they wanted to introduce, which the district court properly excluded for a variety of reasons, those did not in any way indicate that the withdrawals from the pension plan had been improper. There was nothing to support that, even if his testimony had come in. My impression, tell me if I've got this right or not, it was not her contention that she was aware of some prior practices and thought because it had been done before she could continue doing it, but rather she had no idea what was going on before and found herself in a whole new boat that she'd never been in before. Do I understand that right? I believe that's correct, Your Honor. She claims that she didn't know there were pension funds at all, so to the extent prior presidents made improper withdrawals, she would not have known about that if she didn't know the accountants. Was there any evidence on her part that she was relying on past practices? Your Honor, I believe her testimony in the evidence was that she relied on the company's controller who had been there before. So through him, if he followed the past practices, that's what she would have relied on. But she did not consult with Mr. Clark about running the company, so any testimony he could have had about her sophistication, there was just a lack of foundation. She testified before Clark and did not mention him at all. Rather, she said when she took over the company, she consulted with her brother-in-law and his father-in-law who advised her that they thought she could keep the company going. And, Your Honor, I see that I'm out of time, so unless the Court has any additional questions. Okay, thanks for your argument. Let's give Defense Counsel two minutes for rebuttal. Thank you, Your Honor. I'd like to make two quick points in rebuttal. First, the government says that the district court understood the correct mens rea in this case. I don't think that's a tenable argument. If you look in the excerpts, you'll see that on the first day evidence was taken, the district court said the government has to show that the defendant did the act knowingly. That was on the first day of evidence. Then when the final jury instructions were finalized after the close of evidence, the court said, I want to instruct the jury on willfulness because that's the mens rea issue here. And the government cannot point to anything in between those two statements that suggests the district court appreciated a willfulness mens rea applied in this case. What exactly is the difference between those two? Can you help me figure that out? I can. Your Honor, a knowledge standard just requires the defendant to understand the act that she's committing, to be aware of the act. So under a knowledge standard, at the point where the defendant authorized these transfers, that would be enough. What would she have to know under a knowledge standard? I think this court's model instruction on knowledge says you have to understand the act, and that's basically all it says. She would have to know that the funds were ERISA funds, which she would have to know under the knowing standard? I don't see anything in this court's model instruction that would suggest she would have to know it's ERISA funds. Just like if you rob a bank under a knowledge standard, you don't need to know it's an FDIC-insured bank, for example. You just need to know that you are holding a gun to a teller. You know, I'm looking at one of our cases, Erickson, 2011 case, and at page 1147 they say, with respect to the mistake of law argument, we held that although the defendant must knowingly act wrongfully. Right. Yes, Your Honor, and the key phrase there is she must knowingly act wrongfully. She must understand the wrongfulness of what she's doing, which is not the case under a knowledge standard, and it's what the district court failed to appreciate when excluding all this evidence. Again, I don't get how the willful standard would help you if the judge gave the knowing instruction what extra they would have to prove. I mean, under the willfulness instruction, they have to prove that she knew these were pension funds. Isn't that encompassed in the knowing standard? No, I don't think it is, Your Honor. That's what knowledge means. But, Your Honor, knowledge means you're aware of the act that you're committing. It doesn't necessarily mean that you're aware of all the peripheral details that criminalize that act. So the example I gave you is when you rob an FDIC-insured bank, that's a federal crime, but you don't need to know that it's an FDIC-insured bank. The language I was quoting says wrongfully to deprive another of property. Right, which, again, I think means, as I said at the beginning of my argument, she needs to appreciate that this money is not the businesses to spend, that it belongs to someone else. She needs to understand. Is the line on that formulation? Yes, Your Honor, knowingly act wrongfully to deprive another of property. The government had to prove that she knew this was someone else's property. You said that the instruction didn't, that Judge Phillips didn't appreciate the willfulness aspect. I'm sorry, Your Honor. That instruction is actually, I think you'll also find it in Wiseman, and it's actually an elaboration on the willfulness standard. So it's not a separate knowledge standard. It's an elaboration of what it means to act willfully, which is you have to know that what you're doing is wrong. I see I'm way over time, Your Honor. Can we just, Judge Silverman, do you have additional questions? No, thank you very much, Judge. Let me just ask one last question, because your opponent was allowed to go outside the record in characterizing what was in the Chandler report. Do you dispute that? Your Honor, I don't. I haven't looked at that report in months, and my memory is fuzzy, but that sounds right to me. But that was the second point I wanted to come to, is you asked me at the beginning of argument whether she has to know, whether it's enough for her to know it's pension funds. And you said there's no authority in this court for the proposition I was citing. I would refer you to the Andreen case where the willfulness standard was first articulated. Have you spelled it? It's A-N-D-R-E-E-N. It's an opinion by then-Judge Kennedy in which he explained the reason we have a willfulness requirement is because sometimes it's confusing what you can do with pension funds. I don't have the exact language in front of me, but he says this gets very complex, and that's what the willfulness requirement guards against. So I think that supports the point we were making, that if she was told this was okay, that's an example of how this can all be very confusing, and that's exactly what the willfulness requirement is supposed to protect her from. The Erickson opinion I was quoting from starts out with the Andreen case. Yes, and that's the first opinion of this court elaborating the willfulness standard. Thank you, Your Honor. Thank you very much for your argument. The case just argued will be submitted.
judges: Silverman, Fisher, Watford